# Illinois Official Reports

## Appellate Court

---

### *People v. Salgado*, 2016 IL App (1st) 133102

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PAUL SALGADO, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-13-3102 |
| Filed | September 23, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 00-CR-09446; the Hon. Carol M. Howard, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Jonathan Yeasting, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Eric Leafblad, and Christine Cook, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE LAMPKIN delivered the judgment of the court, with opinion.<br>Presiding Justice Gordon and Justice Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1        Defendant, Paul Salgado, who was convicted of first degree murder, appeals from the trial court's dismissal of his postconviction petition at the second stage of postconviction proceedings. On appeal, defendant alleges that he made a substantial showing that (1) he was denied effective assistance of counsel when appellate counsel failed to raise the issue of trial counsel's pursuit of a voluntary intoxication defense, which was not a legally cognizable defense to the general intent murder charges defendant faced and (2) the State violated his due process rights by using testimony from a witness who denied receiving any promise from the State in exchange for his trial testimony despite receiving a bond reduction in his pending murder case. Defendant also argues this cause should be remanded for a new second-stage proceeding because his postconviction counsel rendered unreasonable assistance by failing to amend defendant's *pro se* supplemental petition and failing to certify that amendment was unnecessary.

¶ 2        For the reasons that follow, we affirm the trial court's summary dismissal of defendant's postconviction petition.

## I. BACKGROUND

¶ 3

¶ 4        In the early morning on January 29, 2000, defendant, in the presence of Francisco Navarro, fatally shot Julio Rodarte at close range. Defendant shot the victim once in the face and four times in the back. On the evening of February 3, 2000, detectives Zalatoris and Darcy took Navarro and later defendant to the police station in connection with the murder. Detective Zalatoris questioned defendant, who initially denied any involvement in the murder. At 2 a.m. on February 4, 2000, Navarro told the police that he saw defendant shoot the victim, and the police officially placed defendant under arrest for the murder. On February 5, 2000, defendant signed a consent waiver to record a video statement, waived his rights to counsel and to remain silent, and gave a videotaped confession to the murder. Defendant was often emotional and wept during the recording.

¶ 5        In his recorded confession, defendant stated that he had been treated well by the police and assistant State's Attorney (ASA). Defendant explained that he, Navarro, and the victim were friends and members of the Two-Sixers street gang. On the afternoon of Friday, January 28, the victim went to defendant's house and borrowed the gang's gun, a .38 revolver. Later that evening, defendant went to a bar with a friend and drank beer and tequila. Later, they went to the friend's house and drank more tequila. Eventually, they encountered three more friends, including the victim, and agreed to "party." While three of the friends drove off to get cocaine, defendant and the victim walked to Navarro's house. Then Navarro drove his sports utility vehicle (SUV), with defendant in the front passenger's seat and the victim in the backseat, to meet their three friends, who were using cocaine. Defendant went over to the group and used some cocaine and then returned to the front seat of Navarro's SUV. The victim was in the backseat and hid the gang's gun there. Navarro drove to a gas station and started pumping gas. However, a police car pulled into the gas station, and Navarro drove away without finishing at the gas pump because the group feared a search of the SUV would uncover their gang gun.

¶ 6        Defendant stated that they bought a 24-pack of beer and drove around drinking. Defendant advised the victim to stop smoking "rocks" and stealing cars because it was not good for him and he should straighten out his life. Then they bought some marijuana laced with

phencyclidine (PCP) and smoked it while they continued to drink beer. Navarro, however, did not smoke very much because he was driving. After driving around for about three hours, they stopped in an alley to urinate. Defendant was mad at the victim and argued with him but could not remember why. Defendant jumped out of the front seat of the SUV and told the victim to also get out. The victim complied, and defendant told him to wait while defendant retrieved a beer from the backseat of the SUV. Instead, defendant retrieved the gun from the backseat, pointed it at the victim from only a couple of feet away, and fired three gunshots. Defendant jumped into the SUV and told Navarro to drive. Navarro asked defendant why he had shot the victim, and defendant lied, saying the victim had threatened to kill defendant earlier that day.

¶ 7       Defendant stated that he was in shock and did not understand his actions but conceded that he knew the victim was standing in front of him and the gun was loaded when he aimed it at the victim and fired. Navarro drove defendant to his girlfriend's house, and defendant telephoned his mother and told her he had shot one of his friends but did not know why. Defendant's mother arrived and drove him to his aunt's house. On the way, defendant told his mother to stop the vehicle on a bridge, and defendant exited the vehicle and threw the gang gun into the river. Defendant returned home the next day and went to Navarro's house across the street that afternoon. Defendant admitted to Navarro that the victim never threatened to kill defendant; however, defendant, fearing Navarro would not stand by him if he simply explained that he shot the victim because he was drunk, told Navarro a new lie—that the victim had betrayed the Two-Sixers by giving rival gang members information concerning the Two-Sixers' addresses, hangouts, and guns. Defendant told Navarro to tell anyone who asked that they had dropped the victim off at someone's house about 10 p.m. on the night of the shooting.

¶ 8       At the end of the recording, defendant said that he wanted whoever viewed the recording to take into consideration that he did not know what he was thinking at the time of the shooting and was under the influence of drugs and alcohol. He hoped God would forgive him because the victim was one of his friends.

¶ 9       The State charged defendant with six counts of first degree murder, which included three counts of intentional murder and three murder counts alleging defendant shot the victim knowing that such an act would cause death or great bodily harm.

¶ 10      In January 2001, defendant's trial counsel moved the court to quash the arrest and suppress evidence and to suppress defendant's statements. The trial court found that no probable cause existed when the police picked defendant up at his home but probable cause arose at 2 a.m. on February 4, 2000, when Navarro implicated defendant in the victim's death. The court found that defendant had been at the police station for a "short time" and, therefore, denied defendant's motion to quash the arrest and suppress evidence.

¶ 11      At a separate evidentiary hearing on defendant's motion to suppress statements, the State's evidence established Detective Zalatoris advised defendant of his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436 (1966)) before speaking with him in an interview room at the police station on the evening of February 3. Defendant's attorney spoke privately with defendant on February 4 and they both informed Zalatoris that defendant did not want to talk to the police any further. On the morning of February 5, Zalatoris checked on defendant, who asked for a soda. Zalatoris did not want to speak with defendant outside the presence of his attorney, so Zalatoris asked another detective to get a soda for defendant. Defendant, however, asked Zalatoris if he could talk to him for a second and tell him "what went down." Zalatoris informed defendant that he had a lawyer and did not have to speak to the police, but defendant

wanted to speak with Zalatoris anyway. Zalatoris then read defendant his *Miranda* rights and told him he could have his attorney present. Defendant indicated he understood his rights, and detectives Zalatoris and Ronnie Lewis interviewed defendant, who gave a statement.

¶ 12    At 5 p.m. on February 5, 2000, Detective Lewis and ASA Dan Tiernan interviewed defendant. This interview was substantially similar to defendant's prior interview with detectives Lewis and Zalatoris. At 7:55 p.m., defendant made a third statement in the form of his videotaped confession. Prior to videotaping defendant's statement, ASA Tiernan read defendant his *Miranda* rights, and defendant signed a consent form to give a videotaped statement. On the videotape, defendant said he understood his rights and still wanted to make a statement. He also signed a video waiver that waived his right to have an attorney present.

¶ 13    Defendant testified that he gave the videotaped confession because the police and ASA Tiernan told him that he would be helped. After his attorney left on February 4, the detectives were upset that defendant chose not to speak with them, entered the interview room, and handcuffed him to the wall. The detectives asked him about the murder and location of the gun. Detective Darcy hit defendant on his left ear, and Detective Zalatoris said defendant's attorney worked for the police. The detectives left but returned again and asked the same questions. Then Navarro was brought into the interview room and told defendant to tell the detectives about the murder. Defendant said he did not know what Navarro was talking about and asked to be left alone. Defendant fell asleep, but Zalatoris and Darcy woke him up and asked him more questions, and Zalatoris hit defendant in the mouth and on the right side of his forehead, knocking him to the ground. Detective Lewis said defendant's charges would be reduced to second degree murder and he would be back with his family in five years or less if he would make a confession. Defendant agreed to give a statement but asked the detectives to call his attorney first. The detectives, however, claimed they tried but were not able to reach defendant's attorney. Defendant then gave a statement to detectives Lewis and Zalatoris. Later, defendant gave a video-recorded statement to ASA Tiernan, who told defendant the charges would be reduced to second degree murder.

¶ 14    ASA Tiernan testified that he advised defendant of his rights, and defendant chose to give a videotaped confession. Defendant signed the videotaped consent form in Tiernan's presence and never said that he would not talk without his attorney present or that detectives had beat him.

¶ 15    The trial court denied defendant's motion to suppress statements because, although he initially invoked his rights to remain silent and to counsel, he knowingly and voluntarily waived those rights when he reinitiated a conversation with Detective Zalatoris, who was found to be a credible witness.

¶ 16    A month before trial, defendant's attorney informed the State and the court that the defense would raise a voluntary intoxication defense. The day before trial began, the State nol-prossed the three counts of intentional murder, which required a showing of specific intent and would have been subject to the voluntary intoxication defense.

¶ 17    At the November 2002 bench trial, the State presented the testimony of Navarro, ASA Tiernan and Detective Zalatoris. Their testimony was generally consistent with defendant's video-recorded statement and the testimony presented during the previous hearings on the motions to quash the arrest and suppress statements. Detective Zalatoris added that after defendant voluntarily gave his statement to the police, he showed Zalatoris the location where he threw the gun into the river. He also hugged Zalatoris and thanked him for being a friend.

¶ 18 Furthermore, Navarro added that on the night of the shooting, they initially drove to a friend's house and the victim, pursuant to defendant's instructions, retrieved the gun and hid it under the backseat. During that evening, defendant had purchased the gas, alcohol, and marijuana. When they were low on gas again, they stopped at a gas station, and defendant became angry when he realized he had only $3. They were all outside the SUV, and defendant accused the victim of taking his money, but the victim denied the accusation. There was also an argument that the victim owed defendant some money. Navarro decided to drive everyone home, and defendant, instead of returning to the front passenger's seat he had occupied that evening, entered the backseat of the SUV, so the victim sat in the front passenger's seat. Defendant told Navarro to stop in an alley so he could urinate. When defendant exited the SUV, he stood by the back door and told the victim to exit the SUV. The victim and Navarro laughed because defendant seemed "drunk," but the victim complied and exited the SUV. Then defendant raised his hand and shot the victim in the face. The victim ducked and ran toward the front of the SUV, but defendant followed him and fired two more shots. The victim ran and "flipped" over a fence. Defendant got in the front passenger's seat of the SUV and yelled at Navarro to drive. Defendant seemed "mad" and "crazy" and told Navarro that he had just saved Navarro's life. Navarro feared defendant, who pointed the gun at Navarro until he dropped defendant off. During that evening, Navarro did not observe defendant have any difficulty exiting the car, walking, or talking.

¶ 19 The defense did not present any evidence. At the conclusion of the bench trial, the court found defendant guilty of the three general intent counts of first degree murder. The court sentenced him to 30 years' imprisonment for first degree murder and an additional consecutive 25 years' imprisonment for causing the victim's death with a firearm.

¶ 20 On the appeal from the conviction, defendant argued that (1) he was detained without probable cause, (2) he was interrogated after he invoked his constitutional right to counsel and to remain silent, (3) the police unreasonably delayed his probable cause hearing before a judge, (4) the State deprived him of his right to present a voluntary intoxication defense when it nol-prossed the specific intent charges of first degree murder the day before trial, and (5) the 25-year firearm sentencing enhancement was unconstitutional. This court found the police lacked probable cause to arrest defendant, vacated his conviction, and remanded the cause for a hearing to determine whether defendant's incriminating statements were sufficiently attenuated from his arrest. *People v. Salgado*, No. 1-03-1753 (2006) (unpublished order under Supreme Court Rule 23).

¶ 21 On remand, the trial court found that defendant's statements were sufficiently attenuated from his arrest to render the statements admissible and, consequently, reinstated defendant's conviction and sentence. Defendant appealed, and this court affirmed the trial court's ruling. *People v. Salgado*, 396 Ill. App. 3d 856 (2009).

¶ 22 In January 2011, defendant, through privately retained counsel, filed a postconviction petition, alleging that (1) trial counsel was ineffective for failing to impeach Navarro at the attenuation hearing and (2) the State's failure to disclose to the defense Navarro's cooperation agreement with the State denied defendant due process and a fair trial. The State moved to dismiss defendant's postconviction petition, and the defense filed a response.

¶ 23 In March 2012, defendant filed a *pro se* supplemental brief, contending trial counsel was ineffective for presenting a voluntary intoxication defense for a general intent crime and failing to move to suppress identification evidence, and appellate counsel was ineffective for failing to

- 5 -

raise the issue of trial counsel's ineffectiveness. This *pro se* brief contained numerous exhibits and stated that postconviction counsel had reviewed this document and informed defendant that counsel "believed the issues would not survive the *Strickland* [two-prong test]."

¶ 24     The State moved to strike the *pro se* brief. At the June 2012 hearing on the State's motion, defendant acknowledged that he was represented by his attorney, who had conferred with defendant about the case and all the issues he wanted included in the petition. The trial court granted the State's motion to strike. The court explained it would not allow defendant to file the *pro se* brief because he was represented by counsel but counsel could amend the petition to include the issues raised in the *pro se* brief. The court continued the cause for four weeks.

¶ 25     Thereafter, defendant's postconviction counsel filed a motion to supplement the petition by adopting the *pro se* brief. The trial court granted the motion, and the State amended its motion to dismiss. A hearing was held on the State's amended motion in July 2013, and the trial court granted that motion and dismissed defendant's petition in September 2013. Defendant timely appealed.

¶ 26                                          II. ANALYSIS

¶ 27     On appeal, defendant argues he is entitled to an evidentiary hearing on his claims that (1) his trial counsel was ineffective for asserting a voluntary intoxication defense for a general intent crime for which voluntary intoxication was not a defense, and appellate counsel was ineffective for failing to raise this issue and (2) the State violated his due process rights by failing to disclose it had made a deal with Navarro to lower the bond on his unrelated murder case. Defendant also argues postconviction counsel failed to provide reasonable assistance by failing to amend defendant's *pro se* supplemental petition to include necessary evidentiary support for a claim of ineffective assistance of counsel.

¶ 28     A proceeding under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2010)) is a collateral attack on the defendant's prior conviction and allows only constitutional claims to be heard that were not presented during trial and could not have been raised on the appeal from the conviction. *People v. Harris*, 224 Ill. 2d 115, 124-25 (2007). Therefore, *res judicata* bars any issues previously decided at trial or on appeal and issues that could have been presented on the appeal from the conviction but were not. *People v. Blair*, 215 Ill. 2d 427, 443-47 (2005).

¶ 29     In noncapital cases, the Act provides a three-stage process for hearing a petitioner's constitutional claims. *Harris*, 224 Ill. 2d at 125. A petition that states the gist of a constitutional claim advances from the first stage to the second stage if the trial court examines it independently and determines it is not frivolous or patently without merit. 725 ILCS 5/122-2.1 (West 2010). A petition is frivolous and patently without merit when it has no arguable basis in either fact or law. *People v. Hodges*, 234 Ill. 2d 1, 13 (2009). At the second stage of the process, the trial court may appoint counsel for the defendant, the petition may be amended, and the State may either answer the petition or move to dismiss it. 725 ILCS 5/122-4, 122-5 (West 2010); *Harris*, 224 Ill. 2d at 126.

¶ 30     The petition may be dismissed at the second stage "when the allegations in the petition, liberally construed in light of the trial record, fail to make a substantial showing of a constitutional violation." *People v. Hall*, 217 Ill. 2d 324, 334 (2005). At this stage, the court shall focus only on the legal sufficiency of the claims, and all well-pleaded facts in the petition and any accompanying affidavits that are not positively rebutted by the record are taken as

true. *People v. Domagala*, 2013 IL 113688, ¶ 35. Any fact-finding or witness credibility determinations must await an evidentiary hearing at the third stage of the postconviction proceedings. *Id.* The defendant, however, is not entitled to an evidentiary hearing as a matter of right; the allegations of the petition must be supported by the record or by accompanying affidavits, and nonspecific and nonfactual assertions that merely amount to conclusions are not sufficient to warrant a hearing under the Act. *People v. Coleman*, 183 Ill. 2d 366, 381 (1998). When, as here, a petition is dismissed at the second stage of the postconviction process, we review the matter *de novo. People v. Whitfield*, 217 Ill. 2d 177, 182 (2005).

¶ 31                              A. Ineffective Assistance of Counsel

¶ 32    Defendant argues his petition made a substantial showing that counsel at the bench trial was ineffective because, instead of arguing reasonable doubt, he relied on a voluntary intoxication defense even though it was not a legally cognizable defense to the general intent murder counts defendant faced. Defendant contends that this error, in conjunction with trial counsel's concession during opening and closing argument that defendant committed the shooting, deprived defendant of a meaningful defense and resulted in the trial court's quick finding that defendant was guilty of murder. Defendant also alleges appellate counsel was ineffective for failing to raise ineffective assistance of trial counsel. On this theory, defendant asks this court to find *per se* ineffectiveness of counsel.

¶ 33    Defendant explains that when he was awaiting trial, voluntary intoxication was a defense under Illinois law only for specific intent crimes. Shortly before the bench trial, however, the State dropped every charge that included specific intent as an element and thereby eliminated voluntary intoxication as a legally valid defense. In 2002, the relevant statute was amended to eliminate the defense of voluntary intoxication, but the pre-2002 version of the statute applied to the charges against defendant. See Pub. Act 92-466, § 5 (eff. Jan. 1, 2002). The pre-2002 version provided, *inter alia*, that a person who was in an intoxicated or drugged condition was criminally responsible for his conduct unless his condition was so extreme as to suspend the power of reason and render him incapable of forming a specific intent that was an element of the offense. 720 ILCS 5/6-3 (West 2000). Defendant asserts counsel persisted in pursuing the voluntary intoxication defense despite the inapplicability of that defense to the remaining general intent charges.

¶ 34    A defendant alleging a claim of ineffective assistance of counsel must satisfy both prongs of the test discussed in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), which requires a showing that "counsel's performance was deficient" and the deficient performance "prejudiced the defense." To satisfy the first prong, the defendant must show "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. The second prong requires the defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. If an ineffectiveness claim can be disposed of on the ground of insufficient prejudice, then that course should be taken, and the court does not need to consider the quality of the attorney's performance. *Id.* at 697.

¶ 35    In reviewing a claim of ineffective assistance of counsel, this court reviews counsel's actions under the totality of the circumstances of the individual case. *People v. Shatner*, 174 Ill. 2d 133, 147 (1996). Judicial scrutiny of counsel's performance is highly deferential, and

counsel's trial strategy is given a strong presumption of reasonable professional assistance. *Strickland*, 466 U.S. at 689. To establish deficient performance, defendant must identify counsel's acts or omissions that allegedly are not the result of reasonable professional judgment and overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy. *People v. Perry*, 224 Ill. 2d 312, 341-42 (2007); *Strickland*, 466 U.S. at 690. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Defendant must show that counsel's errors were so serious and his performance was so deficient that he did not function as the counsel guaranteed by the sixth amendment. *Perry*, 224 Ill. 2d at 342.

¶ 36    The same two-prong *Strickland* standard applies to claims of ineffective assistance of appellate counsel. Moreover, "[a]ppellate counsel is not obligated to brief every conceivable issue on appeal, and it is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong." *People v. Easley*, 192 Ill. 2d 307, 329 (2000). Therefore, a defendant is not prejudiced by appellate counsel's choice not to raise certain issues unless those issues have merit. *Id.* If a defendant claims that appellate counsel was deficient for failing to raise the issue of trial counsel's ineffectiveness, then the focus must be on trial counsel's performance. *People v. Coleman*, 168 Ill. 2d 509, 522-23 (1995).

¶ 37    To circumvent the *Strickland* test and instead assert the exceptional situation of *per se* ineffectiveness, a defendant must prove his counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing." *People v. Kozlowski*, 266 Ill. App. 3d 595, 600 (1994); see also *People v. Nieves*, 192 Ill. 2d 487, 494-95 (2000). A defendant "faces a high burden" of establishing counsel's complete failure to subject the State's case to meaningful adversarial testing "before he can forsake the two-part *Strickland* test." *People v. Johnson*, 128 Ill. 2d 253, 269-70 (1989). Moreover, it is not "*per se* ineffectiveness whenever the defense attorney concedes his client's guilt to offenses in which there is overwhelming evidence of that guilt." *Id.* at 269.

¶ 38    Defendant asks this court to find that trial counsel was *per se* ineffective and claims that his case falls "squarely within a pattern of cases where counsel has been held ineffective for persisting in a defense that Illinois law makes unavailable." We disagree. The record refutes defendant's claim that trial counsel failed to present any meaningful adversarial testing. Trial counsel moved to reduce defendant's bond; filed and litigated the suppression motions; raised in pretrial proceedings the defense of voluntary intoxication and thereby prompted the State to drop the three specific intent murder charges; cross-examined every witness; moved to dismiss the indictment; attempted to address the overwhelming evidence of defendant's guilt in the most credible and reasonable manner possible; asked for a finding of not guilty or, in the alternative, a second-degree murder finding; and moved for a new trial. During cross-examination, trial counsel questioned the credibility of Detective Zalatoris's general progress report and tried to damage Navarro's credibility. Accordingly, defendant must meet his burden under the *Strickland* test to prevail on his ineffective assistance of counsel claim.

¶ 39    Defendant's claim that trial counsel erroneously pursued only an unavailable intoxication defense for a general intent crime is not accurate. The record establishes that counsel presented a defense theory that there was abundant evidence in mitigation to indicate that defendant

should be found guilty of the reduced offense of second degree murder based on his mental state at the time of the shooting. Counsel presented a defense tantamount to passion, arguing that defendant was not in his proper state of mind because he was extremely intoxicated and high from alcohol and marijuana laced with PCP. Counsel argued defendant's crazed mental state at the time of the shooting was corroborated by defendant's videotaped confession, wherein defendant claimed he did not remember why he was arguing with the victim or understand why he reached for the hidden gun instead of another beer. Moreover, defendant cooperated with the police and ASA, waiving his rights to remain silent and to counsel, and honestly told them what he could recall because the guilt from his spontaneous and "crazy" act of killing one of his friends was "eating him from the inside to outside" and "he had to get it off his chest." The record establishes that the evidence regarding intoxication was presented to induce sympathy and present mitigation. Counsel's decision to argue intoxication as a factor in mitigation was simply trial strategy, and strategic decisions are not second-guessed by this court. *Strickland*, 466 U.S. at 691. Consequently, defendant cannot meet his burden to show counsel's strategy concerning the intoxication evidence constituted deficient performance.

¶ 40     Even assuming, *arguendo*, that counsel's decision to argue the intoxication evidence as mitigation constituted deficient performance, defendant cannot meet his burden under the prejudice prong of *Strickland*. Defendant's petition does not make a substantial showing that there was a reasonable probability that the result of the trial would have been different but for counsel's alleged deficient performance. Based on the overwhelming nature of the evidence of defendant's guilt presented at the trial, including his own voluntary, videotaped confession, defendant cannot meet his burden concerning a reasonable probability that the result of the trial would have been different but for counsel's use of the intoxication evidence. This court previously ruled that defendant's videotaped confession was admissible, and defendant essentially made the same claim in that confession that he attacks here, *i.e.*, that his intoxicated condition caused him to shoot his friend. Furthermore, the State challenged defendant's claims of severe intoxication by showing that defendant walked around the gas station, purchased gas and beer, warned his companions to leave the gas station when the police arrived, conversed with his friends throughout the evening, and entered and exited the SUV multiple times without any difficulty. Clearly, the nature or degree of defendant's intoxication was at issue in this case.

¶ 41     In determining if under all of the circumstances counsel's assistance was ineffective, the court considers the entire record rather than isolated incidents of conduct. *People v. Kluppelberg*, 257 Ill. App. 3d 516, 526 (1993). Here, counsel aggressively and ably represented defendant where counsel moved to reduce defendant's bond, filed and litigated motions to quash arrest and suppress defendant's statements, prompted the State to dismiss the specific intent counts by raising the voluntary intoxication defense, challenged the constitutionality of the general intent counts, moved for a new trial, and filed a motion to reconsider the sentence. Counsel also presented evidence in mitigation at sentencing, noting that defendant obtained his GED and completed bible study courses during his incarceration. When the trial court issued a mid-range sentence of 30 years for first degree murder plus 25 years for using a firearm, the court noted that the crime was not planned, as argued by defense counsel.

¶ 42     Navarro's credible eyewitness testimony was fully corroborated by the physical evidence and defendant's three consistent statements to the police and ASA, including defendant's very

emotional and compelling videotaped confession. Defendant was not convicted because an intoxication defense was unavailable or the passion defense was insufficient; he was convicted because there was very little leeway to credibly attack the overwhelming evidence against him. We conclude defendant has not made a substantial showing of ineffective assistance of trial counsel to proceed to an evidentiary hearing. For the same reasons, we also find defendant has not made a substantial showing of ineffectiveness of appellate counsel for not raising the ineffective assistance of trial counsel. Because the underlying claim of ineffective assistance of trial counsel lacks support, defendant's claim of ineffective assistance of appellate counsel also fails. See *People v. Smith*, 2014 IL 115946, ¶ 37; *Harris*, 224 Ill. 2d at 120.

¶ 43                                                B. Due Process Violation

¶ 44      Defendant contends he made a substantial showing that the State violated his due process rights by failing to correct Navarro's false testimony at defendant's November 2002 trial. Specifically, Navarro testified that no promises were made to him concerning his unrelated, pending murder case, No. 01-CR-23533, in exchange for his testimony in defendant's case. Defendant asserts that Navarro's receipt of a dramatic bond reduction while the State's case against defendant was pending indicates Navarro had a deal that the State would assist him in the reduction of his bond for his murder case in exchange for his testimony against defendant.

¶ 45      To support this claim, defendant attached a summary of Navarro's statement of conviction/disposition in his murder case. According to the summary, on September 13, 2001, the trial court found probable cause to detain Navarro without bail. On September 17, 2001, Navarro moved the court for a bail reduction, and the trial court set bail at $400,000. On October 3, 2001, Navarro was charged with multiple counts of murder, attempted murder and aggravated discharge of a firearm. Navarro pled not guilty and was in custody until he was released on bond on March 13, 2002. He was in custody again in December 2002 but on bond again in February 2003. He moved the court to suppress his statements in March 2004, was in custody in August 2004, and on bond again in September 2004.

¶ 46      Defendant also submitted a January 2011 affidavit from Hugo Garcia, who stated he knew defendant and Navarro since they were teenagers. They went to the same high school and grew up in the same neighborhood. In November 2010, Garcia went to Navarro's home, and Navarro told him he "had cut a deal with the State to reduce his bond on a murder case separate from [defendant's case] in exchange for his testimony against [defendant]." Garcia averred Navarro told him the State helped lower Navarro's bond so he was able to get out of jail and therefore he testified against defendant. Garcia claimed Navarro also said he was beaten by the police in order to provide his statement implicating defendant while in the police station. Garcia also averred Navarro said he would not talk to defendant's attorney or anyone else about these facts because Navarro's parents would not permit him to do so. Garcia conveyed this information to defendant's attorney in January 2011.

¶ 47      To establish a due process violation warranting an evidentiary hearing, "the defendant must show that there was action by the State inconsistent with fundamental principles of liberty and justice reflecting the community's sense of fair play and decency." *People v. Cihlar*, 111 Ill. 2d 212, 216 (1986). Generally, petitions supported by an affidavit containing only hearsay are insufficient to warrant postconviction relief. *People v. Brown*, 2014 IL App (1st) 122549, ¶ 58. Affidavits must be made by a person having "firsthand knowledge of the

factual allegations" and must be capable of independent corroboration under the Act. *People v. Perkins*, 260 Ill. App. 3d 516, 518 (1994); *Brown*, 2014 IL App (1st) 122549, ¶ 47.

¶ 48 We conclude defendant has failed to meet his burden to make a substantial showing the State violated his due process rights by using alleged perjured testimony concerning a deal to obtain Navarro's testimony against defendant. Defendant's claim is entirely conclusory, and Garcia's affidavit is pure hearsay. A petition supported by an affidavit based only on hearsay is insufficient to warrant relief. *People v. Cole*, 215 Ill. App. 3d 585, 588 (1991). Furthermore, the fact that Navarro's bond was reduced does not corroborate Garcia's statements or make his hearsay affidavit more reliable. Bonds are reviewed and reduced by the court regularly, and defendant's mere presentation of documents that show Navarro's bond was reduced is not sufficient or proper support for his speculative claim that Navarro had a deal with the State to exchange his trial testimony against defendant for a bond reduction. Defendant has not attached any transcript or record of Navarro's bond hearing or any document indicating any agreement between Navarro's attorney and the State about a bond reduction. Defendant has the burden of making a substantial showing of a constitutional violation (*People v. Bailey*, 374 Ill. App. 3d 1008, 1018 (2007)), and the failure to include supporting affidavits, records, or other documents is fatal to a postconviction petition (*People v. Collins*, 202 Ill. 2d 59, 66 (2002)). When a court is presented with a petition that is not supported by affidavits or other documents, the court may presume that counsel made a concerted effort to obtain some documentation to support the postconviction claims but could not find that support. *People v. Waldrop*, 353 Ill. App. 3d 244, 250 (2004).

¶ 49 In addition, the record rebuts defendant's assertion that Navarro testified against defendant at the November 2002 trial in exchange for a September 2001 bond reduction because Navarro had already implicated defendant and given his statements to the police and ASA in February 2000. Furthermore, Navarro testified against defendant at the grand jury on February 8, 2000. Consequently, Navarro's consistent and incriminating statements and testimony against defendant were already a matter of record long before Navarro was detained without bail on his own murder case on September 13, 2001.

¶ 50 Defendant cites *Cihlar*, 111 Ill. 2d 212, and *People v. Sanchez*, 115 Ill. 2d 238, 284 (1984), to support his claim that Garcia's hearsay affidavit was sufficient evidence to advance this suborned perjury claim to a stage-three evidentiary hearing. *Cihlar* and *Sanchez*, however, are distinguishable from the instant case. In *Cihlar*, where the court held the defendant's petition was sufficient to advance to an evidentiary hearing, the supporting statements to that petition were challenged on the grounds of cumulative evidence and waiver, not on the basis of hearsay. The defendant in *Cihlar* was convicted of rape, burglary, and home invasion based only on the victim's uncontradicted trial testimony that she could identify defendant as her assailant from a lineup and at trial because his facial features were not covered at the time of the offense. *Cihlar*, 111 Ill. 2d at 215-17. The defendant filed a postconviction petition supported by a statement from the victim's neighbor, who would testify that the victim told her the assailant wore clothing over his head that had covered his features except for two openings for his eyes. *Id.* at 215. The petition was also supported by the statement of another woman, Longo, who had testified both at the trial and the posttrial motion hearing. *Id.* at 215, 218. At the hearing, Longo testified only that she had called the police when the victim came to her to report the attack. *Id.* at 215. However, at the posttrial motion hearing, Longo testified that the victim told her the assailant's face was covered, Longo informed the ASA prior to the trial

about this statement by the victim, and the ASA ignored it. *Id.* at 218-19. Consequently, in *Cihlar*, unlike the case before us, there was support in the record for the hearsay statements supporting the postconviction petition. Furthermore, the victim's uncontradicted testimony in *Cihlar* was the only evidence connecting the defendant to the crime, whereas here defendant gave the police and ASA three consistent statements admitting to killing the victim, and Navarro's testimony corroborated those statements along with other physical evidence.

¶ 51    In *Sanchez*, a case involving a petition for relief from judgment, the court decided not to apply the general rule regarding hearsay affidavits "inflexibly" because the primary witness had invoked his fifth amendment right against self-incrimination, the petitioner was facing the death penalty, and procedural fairness and factual accuracy were of paramount importance especially in capital cases. *Sanchez*, 115 Ill. 2d at 284. Procuring proper supporting documentation about Navarro's bond reduction hearing presented no similar problems, and we see no reason to depart from the general rule here.

¶ 52    We conclude defendant failed to make a substantial showing of a due process violation in order to warrant an evidentiary hearing because defendant failed to attach proper documents to support his claim and the record rebuts defendant's claim that a deal existed between the State and Navarro.

¶ 53                    C. Reasonable Assistance of Postconviction Counsel

¶ 54    Finally, defendant claims his retained postconviction counsel failed to comply with the Act's guarantee of reasonable assistance and the certificate filing requirement of Illinois Supreme Court Rule 651(c) (eff. Feb. 6, 2013), *i.e.*, stating that counsel consulted with the petitioner to ascertain his claims of deprivations of constitutional rights, examined the record, and made any amendments to a *pro se* petition that were necessary for an adequate presentation of the petitioner's claims.

¶ 55    Defendant acknowledges that he did not file a *pro se* petition but contends his situation is akin to that of a *pro se* petitioner because he attempted to file a *pro se* supplemental brief after his retained counsel filed the petition. We disagree. Our supreme court recently clarified that "[a]lthough Rule 651(c) applies only to a postconviction petition initially filed by a *pro se* defendant ([*People v. Richmond*, 188 Ill. 2d 376, 381 (1999)])," the court "never conditioned the reasonable level of assistance standard [under the Act] on the applicability of [Rule 651(c)]." *People v. Cotto*, 2016 IL 119006, ¶ 41. The certificate requirements of Rule 651(c) are not relevant in the case before us because defendant's initial petition was not a *pro se* filing. Accordingly, we confine our review to defendant's claim that he was denied the reasonable level of assistance guaranteed by the Act. "[T]here is no constitutional right to effective assistance of postconviction counsel. [Citation.] Consequently, the reasonable level of assistance provided for by the Act is 'less than that afforded by the federal or state constitutions.' [Citation.]" *Id.* ¶ 45.

¶ 56    Defendant complains postconviction counsel merely adopted the claims of defendant's *pro se* brief without further developing or shaping those claims. Defendant argues counsel should have developed the claim challenging the voluntary intoxication defense by obtaining affidavits from two potential witnesses who would have implicated Alex Garza as an alternative suspect in the shooting. Specifically, defendant claims (1) the girlfriend of Garza told the police she was pregnant by the victim and thought Garza had killed the victim and (2) a

sister of the victim told the police rival gang members had chased the victim the night before he was killed.

¶ 57 Defendant fails to explain how postconviction counsel should have "properly shape[d]" defendant's *pro se* claims or why further amendments were necessary to adequately present defendant's claims. Defendant himself told the trial court that postconviction counsel had consulted with him about his *pro se* ineffective assistance of counsel claims and concluded that the claims would not pass the *Strickland* analysis (a conclusion we have just confirmed, *supra*). Moreover, it is unclear how hearsay affidavits from Garza's girlfriend or the victim's sister would have supported the claim challenging trial counsel's use of the intoxication evidence where any claim about Garza being implicated as an alternative suspect has been forfeited on appeal. Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016) ("[p]oints not argued [in the appellant's brief] are waived").

¶ 58 Garza's girlfriend and the victim's sister were not witnesses to the shooting, and their testimony would have been inadmissible hearsay. Consequently, there was no need to secure affidavits from them, and the record, which overwhelmingly established that only defendant shot the victim and Navarro was the only other person present at the time of the shooting, refutes defendant's assertion that postconviction counsel failed to adequately and properly present defendant's claims to the trial court. After reviewing the record in this case, it is clear retained postconviction counsel ably discharged his duties. Accordingly, we reject defendant's claim that his postconviction counsel failed to provide reasonable assistance.

¶ 59                                      III. CONCLUSION

¶ 60 For the foregoing reasons, we affirm the trial court's second-stage dismissal of defendant's postconviction petition.

¶ 61         Affirmed.